Baldwin *v.* McArthur.

[Fulton General Term, January 2, 1854. *Hand, Cady* and *C. L. Allen,* Justices.]

------- ◄--►► -------

BALDWIN and others, superintendents of the poor of St. Lawrence county, *vs.* McARTHUR.

In order to abolish the distinction between town and county poor, in a particular county, a resolution to that effect must be passed by the board of supervisors, and the same must be *filed in the county clerk's office.*

Until such a resolution has been filed, in the clerk's office, the distinction is not abolished, and an application to the court for an order of maintenance must be made by the overseers of the poor of the proper town; and not by the superintendents of the poor.

But if the party proceeded against, in the name of the superintendents, is present on the hearing of the application, and consents to the granting of the order, he thereby impliedly admits that the superintendents are the proper parties to make the application; and will not be allowed to raise the objection, on appeal, that the overseers should have applied.

Where an application for an order of maintenance is made to, and granted by,

a court of sessions, it is no objection to the order that it purports to have been made by the "*county court of sessions.*" The word "county," in the description of the court, may be regarded as mere surplusage; especially where no objection is made, at the time, and there is no pretense that the party was misled.

Where one of the members of a court of sessions granting an order of maintenance, is one of the persons who, as superintendents of the poor, apply for the order, the court has no jurisdiction, and the proceedings and order are void.

The statute declaring that no judge of any court can sit as such in any cause in which he is a party, extends to justices of the peace.

THIS was an action to recover for the support of Lovisa Mc-Arthur, the mother of the defendant. The complaint set forth that the plaintiffs were superintendents of the poor of St. Lawrence county; and that the distinction between town and county poor in said county had been abolished before any proceedings were had in this matter. That on the 19th of August, 1848, the said Lovisa, the mother of the defendant, had become poor and old, and unfit and unable to maintain herself, and the defendant having failed to maintain his mother at his own charge, in the manner affirmed by the plaintiffs, application was made "*to the court of the county of St. Lawrence,*" pursuant to the statute, for an order to compel the defendant, who then resided in Canton, in said county, to support her. That a copy of said intended application, with notice, was served on the defendant, and that at a term "of the *county court of sessions,*" held in and for the county of St. Lawrence, at Canton, on the 6th of September, 1848, at which was present the Hon. Edwin C. Dodge and James C. Barton, and Joseph Barney, an order was entered, by consent of the defendant, that he take the said Lovisa to his own house, and there provide for and maintain her; and that in default of his so doing in a suitable and proper manner, he pay weekly to the superintendents of the poor, for the support and maintenance of the said Lovisa, the sum of two dollars, until the further order of the court. The order was not set forth in full in the complaint, but is referred to in the opinion of the court. The complaint then averred that the defendant had neglected and refused, and still did neglect and fail,

to take the said Lovisa to his house, and provide for her in a suitable manner, and the plaintiffs had been obliged to provide for and support and maintain her ; that the defendant had wholly neglected and refused to pay the plaintiff $2 weekly, for the support of said Lovisa, and that $332 still remained due and unpaid to the plaintiffs, at such weekly rate, from September 6, 1848, to the commencement of the suit. And the plaintiffs demanded judgment for that sum, or such other sum as the court might direct.

The answer denied each and every allegation of the complaint, and averred that at the time of making the order, the defendant did immediately take the said Lovisa to his own house, and did there provide for her, and had continued all proper provision for her at his house, and had at all times been ready and willing to provide for her, according to his standing and condition; but that the said Lovisa, combining with divers ill disposed persons, to injure the defendant and render him liable for a breach of the order, had frequently left his house and gone to the house of such persons, and there received from them food and lodging without the consent and against the will of the defendant. The answer denied that the plaintiffs had been obliged to support, or had supported, or paid for the support of, the said Lovisa, and averred that the court had no jurisdiction to make the order in the complaint set forth.

The action was tried at the St. Lawrence circuit in October, 1852. The plaintiffs proved by Bishop Perkins that they were the superintendents of the poor of St. Lawrence county, and that he was clerk of the board of supervisors of the county, and had been since, and for some years before, the year 1852. That a resolution was passed that year as follows : "Resolved that the distinction between town and county poor be abolished. November 17, 1852." The counsel for the plaintiffs offered in evidence the order, a copy of which was set up in the complaint, and produced the records of the court containing it. The reading of the order in evidence was objected to by the defendant's counsel, on the ground that *Joseph Barney* was one of the superintendents who made the application, and was one of the

magistrates who made the order. And also, because it appeared by the order that it was made by the county court and court of sessions; whereas it could only be made by the court of sessions alone. The objections were overruled, and the defendant's counsel excepted. The plaintiffs also gave in evidence, under objection and exception by the defendant's counsel, the application for the order, and notice, and proof of service. *Joseph Barnes* testified for the plaintiff as follows: "In 1848 I was one of the superintendents of the poor of the county of St. Lawrence. The other persons named in the order were also superintendents. I recollect the application." He proved that Lovisa McArthur was old and decrepit and unable to support herself, and called on him for assistance. Other persons with whom she lived from time to time came to him with complaints, and he finally directed Mr. Isham, who was one of them, if she came to him again, to take her to the poor-house. She was received into the poor-house the last of November, 1849. That a notice was served on him by the defendant, which was produced and read in evidence, stating that he, the defendant, had supported his mother for the last 30 years; that he was still willing to support and maintain her in his own family; that if dissatisfied, her dissatisfaction had been brought about by vicious persons; that if she would return he would still support her, as one of his family, but would not pay for her support out of his own family, unless compelled by law. He testified to two or three conversations with the defendant, in one of which the defendant said, after his mother went to the poor-house, that his doors were open to her, but that some bad persons had persuaded her away. The witness desired him to take care of her. He said he would not go after her; she should come back as she went away. In another conversation the defendant said, if they would keep her at the poor-house he would pay the expense of her keeping there. The witness told him they could not keep her there because they were full. The witness paid $32 to James Waller, for keeping Mrs. McArthur. James Waller proved that Mrs. McArthur had been supported at his house in all about a year, for which he charged fourteen shillings per week.

The plaintiff having rested, the defendant's counsel moved for a nonsuit, on the following grounds: 1. That the application for the order on which the plaintiffs founded their right to recover, was made by Joseph Barnes and others, and that said Barnes sat on the bench as one of the justices, to grant it; that he could not be plaintiff and court both. 2. That no neglect to comply with the terms of the order had been shown. 3. That there was no proof that the resolution of the board of supervisors, abolishing the distinction between town and county poor, was ever filed in the county clerk's office, as required by statute; that until that resolution was so filed the distinction was not legally abolished, and the superintendents had no power or authority to apply for the order against the defendant; but it rested with the overseers of the town. 4. That it did not appear, either on the application or by proof, that Mrs. McArthur had no other relative than the defendant able to support her. But the judge decided that although he had serious doubts about the validity of the orders, yet he would not nonsuit the plaintiffs upon any of these grounds, but would allow them to go up by exception.

Cassius Isham then testified for the defendant, that he took Mrs. McArthur to the poor-house in November, 1849, by the direction of Mr. Barnes, superintendent; that he found her at his house when he took her; she had come there that day from the defendant's. Barnes had told him, when she came to his house again, to take her to the poor-house. She was at his house about six months in all. She was in the habit of going back and forth, for two or three months. That he was not aware of the defendant making any effort to keep her at home. Charles Murray testified for the defendant, that he lived at the defendant's when his mother was taken to the poor-house, and had lived there for some years previous, and boarded in the family. Mrs. McArthur was well treated in the defendant's family. She ate at the same table, and had a room by herself. The witness went after her, when the order was granted, and was proceeding with her to the defendant's, when she stopped at James Waller's, and would not go any further. The parties rested; and the

judge, in charging the jury, among other things, stated to them, that every fact which the defendant might have legally urged against the order of the court, under which the plaintiffs sought to recover, he was concluded from contesting now. That the defendant's mother got into the poor-house; the defendant was requested by one of the superintendents to take and support her, and as matter of law he was bound to go after her, and take her home, and maintain her, as the order required. The defendant's counsel excepted to this part of the charge, and requested the court to submit it as a question of fact for the jury, and to charge them, that if the superintendent had put the old lady in the poor-house without good cause, the defendant was not bound to go there for her and bring her away. The judge replied that he thought the defendant was bound to go for her, and refused so to charge, and the defendant's counsel excepted. The jury found a verdict for the plaintiffs for $178.50.

*Barker & Sawyer*, for the plaintiffs.

*James & Brown*, for the defendant.

*By the Court*, C. L. ALLEN, J. The first objection urged against the recovery in this action is, that the order of maintenance, of the 6th of September, 1848, is not valid, because the county superintendents of the poor of St. Lawrence county, had no authority or right to apply for such order. That the distinction between town and county poor had never been *legally* abolished in that county. It does not distinctly appear that the resolution of the board of supervisors was ever filed in the county clerk's office, as required by the statute ; and until that was done, the defendant's counsel insists that no legal change in the pauper system of that county was produced, and that therefore the application should have been made by the overeers of the poor of the town of Canton. The case of *Thompson and others* v. *Smith*, (2 *Denio*, 177,) goes very far to establish the position contended for by the defendant; and had the objection been interposed

before the county court, where the order was granted, I think it would have been well taken. But no such position was there taken. The defendant consented to the order, thereby impliedly admitting that the superintendents were the proper parties to make the application, and that of course the distinction between town and county poor, had been abolished. I think he is too late in presenting the objection here: it is *res adjudicata.* The case of *Embury* v. *Conner*, (3 *Comst.* 511, 522,) establishes the doctrine, conclusively, that the judgment or decree of a court possessing competent jurisdiction is, as a general rule, final; not only as to the subject matter thereby actually determined, but as to every other matter which the parties might litigate in the cause, and *which they might have decided.* And see 12 *Wend.* 399 ; 2 *Barb. S. C. Rep.* 586, and cases cited.

But it is argued that the county court had no jurisdiction to hear or to adjudicate upon this matter. By the 2d section of the act for the relief and support of indigent persons, (1 *R. S.* 614,) it is made the duty of the overseers of the poor of the town where such poor person may be, to apply to the *court of sessions* of the county where such relative may dwell, for an order to compel such relief. By the 14th section of the 6th article of the constitution of 1846, the county judge shall hold the county court, which shall have jurisdiction in special cases as the legislature may prescribe ; and the county judge, with two justices of the peace to be designated according to law, may hold courts of sessions, with such criminal jurisdiction as the legislature shall prescribe, and perform such other duties as may be required by law.

The 4th section of the judiciary act (*Laws of* 1847 *p.* 208) declares, that the courts of sessions of the respective counties, organized by the act, shall possess the same powers and exercise the same jurisdiction, in their respective counties, as are now possessed by and exercised by the courts of general sessions of the peace, so far as the same are consistent with the constitution and the provisions of that act. And the 8th subdivision of the 5th section (*Laws of* 1847, *p.* 209) declares, that every court of sessions shall have power to compel relatives of poor persons and

committees of the estates of lunatics, to support such persons and lunatics, in the cases and in the manner prescribed by law. The manner prescribed by law was the provision in 1 R. S. 614; and the power was thus transferred from the general sessions to the court of sessions.

But the counsel for the appellants, while they concede this, insist that this was not an order of the " court of sessions" of St. Lawrence county, but of the " *county court of sessions*," in and for the county of St. Lawrence. The addition of the word "*county*," in the description of the court may be regarded as mere surplusage. It is in fact the " court of sessions" for the county of St. Lawrence. In *The People* v. *Hawkins*, (5 *How. Pr. Rep.* 3,) the court decided that a *descriptio curiæ* may be treated like a *descriptio personæ*, and any circumstances, false or mistaken, which do not mislead, may be disregarded. No objection was made to the form or caption of the order, or to the description of the court, at the time it was entered, nor to the description of the court in the application. If these had been urged, the court would undoubtedly have ordered an amendment if necessary. The application was in fact made to, and granted by, the court of sessions, and there is no pretense that the defendant was misled or injured by the surplus word used in the description of the court. I think this objection, therefore, cannot be sustained.

The last objection urged against the validity of the order is, that it was not made by a legally constituted court of sessions; and in my judgment this is the most serious one which was offered. Joseph Barnes, who was one of the superintendents at the time the application was made, and on whose motion it was granted, was one of the justices of the sessions which granted the order. The court of sessions by the 11th section of the act, (2 *R. S.* 204,) is to be composed of the county judge and the two justices elected in the manner prescribed in that section. By the act containing general provisions concerning courts of justice, (2 *R. S.* 275, § 2,) it is declared that no judge of any court can sit, as such, *in any cause to which he is a party*, or in which he is interested, or in which he would be excluded from being a juror by reason of consanguinity or affinity to either of the parties.

Baldwin *v.* McArthur.

The question is, was Barnes a party to the suit, within the letter or spirit of the statute ? He ·certainly was not *interested* any more than the county judge, or the other justices of the sessions. They were all citizens of the county, together, and as such were all interested alike in saving the county from as much taxes and expenses as possible. But that fact did not disqualify either of them from acting as judges in the matter before them. Neither was Barnes interested in the question of costs. No costs could have been awarded against him. No costs in this proceeding seem to be allowed by the statute. But if they were allowed they would be collected, by application to the board of supervisors. (2 *R. S.* 474, 475, §§ 114 *to* 120. *Id.* 4*th ed.* 716. *Superintendents of the Poor of Tompkins Co.* v. *Smith,* 11 *Wend.* 181.) He was then a mere nominal party, with others. He was a member of a corporation of individuals composing the board of superintendents of the poor of the county ; a majority of whom, when properly convened, could act and control in matters of business before them. The application was a quasi criminal proceeding, which the statute made it the duty of the superintendents of the poor to institute for the benefit of the whole county, and in which they had no greater or more immediate interest than any other taxable inhabitant of the county. In *The Washington Ins. ·Co.* v. *Price,* (1 *Hopk. Ch. Rep.* 1,) Chancellor Sanford remarked, that it is a maxim of every case, in every country, that no man should be a judge in his own cause ; that it is not left to his discretion, or to his sense of decency, whether he shall act or not ; that when his *own rights* are in question he has no authority to determine the cause. So well, said he, is this principle understood, that in every court consisting of more judges than one, the judge who is a party in a suit takes no part in the proceedings or decision of the cause. Barnes was in fact but a mere nominal party, but the statute makes no distinction of that nature. Its terms are broad and plain. " *No judge of any court can sit, as such, in any cause in which he is a party.*" I do not see how we can avoid this express prohibition. If any exceptions had been intended in the statute, they would probably

have been inserted.    At all events, I think we are not at liberty to make them, or indulge in any speculations on the subject. We are controlled by the law, and are only to pronounce what it is.

It is argued that Barnes was not a *judge*, but a *justice of the peace*, and that the statute applies to judges only, and cannot be carried beyond the plain import of the words used.    But the court, in the case of *Edwards* v. *Russell*, (21 *Wend.* 63,) put a different construction upon the statute, by deciding that the section applied to a justice as well as a judge, and said the same reasons existed for its application there, as well as in higher tribunals.    (*See* 3 *Comst.* 547.    *Hopk. Ch. Rep.* 1.)

It is also argued that the court of sessions was the only court which possessed jurisdiction to grant the order, and, that if Barnes could not have acted as a member of the court, the order could not have been granted.    It has been held that disqualifying statutes do not apply to a judge of a court having exclusive jurisdiction of the matter in controversy, for the reason that the door of justice would thus, as against one of the parties, be effectually barred.    (19 *John.* 501.    6 *John. Ch.* 360.    5 *Paige*, 489.    2 *Barb. Ch. Rep.* 381.)    But the reason does not exist, here, for the application of the rule recognized in the cases cited. The court of sessions of St. Lawrence county was the only tribunal which could grant the order, it is true.    But if Barnes, the superintendent, had absented himself from the bench, or had not attended court on the day the order was granted, it would have been the duty of the county judge to have designated some other justice of the peace of the county to supply the vacancy occasioned by his non-attendance, and thus a court could have been formed free from all legal objection, and fully competent to grant the order.    There was no absolute necessity, therefore, for his sitting as a member of the court.    (*Laws of* 1847, *ch.* 280, §40.    2 *R. S.* 377, 378, 4*th ed.*)    I think, therefore, that the order was invalid, for this reason, that Barnes was a member of the court which granted it, and that the court therefore had no jurisdiction, and the proceedings and order were void.

The judgment of the circuit court must be reversed and a new trial ordered. Costs to abide the event.

